UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                              |     |                                        |
|------------------------------|-----|----------------------------------------|
| UNITED STATES OF AMERICA     | *   |                                        |
|                              | *   |                                        |
|                              | *   |                                        |
|                              | *   |                                        |
| v.                           | *   |                                        |
|                              | *   | Criminal Action No. 24-cr-10208-ADB    |
|                              | *   |                                        |
| JAMEEL GIBBONS,              | *   |                                        |
|                              | *   |                                        |
| Defendant.                   | *   |                                        |
|                              | *   |                                        |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

  Currently before the Court is Defendant Jameel Gibbons's motion to suppress evidence, including drugs, that law enforcement recovered from him following a warrantless search of his person on September 30, 2022.  [ECF No. 68].  For the reasons set forth below, the motion is **DENIED**.

# I.    BACKGROUND

## A.    Factual Background[1]

This motion arises from a stop and subsequent search of Defendant Jameel Gibbons ("Gibbons") by Edward Alldredge ("Alldredge"), a Massachusetts State Police trooper, and Brian Ball ("Ball"), a Boston Police Department detective, that took place shortly after 9:30 p.m. on September 30, 2022, outside 287 Centre Street, Boston, Massachusetts, which is part of the Mildred C. Hailey Apartments (previously known as the Bromley Heath Housing Development), a public housing development located in Boston's Jamaica Plain neighborhood.

Two weeks earlier, on September 15, 2022, Ames Stevens ("Stevens"), a Boston Housing Authority Police Department officer who was monitoring security cameras in the housing development, observed Gibbons engaging in what he thought was a drug transaction with two other men at 287 Centre Street. The following morning Stevens texted fellow officers that Gibbons had "either re-upped or distributed to them."

Then, on September 30, 2022, the day of the challenged search, at approximately 8:30 p.m., Stevens saw Gibbons on a security camera outside a building at 960 Parker Street, also within the Mildred C. Hailey Apartments.[2] Gibbons was with a group of men, including a man later identified as Dominique Finch ("Finch"). Gibbons went inside the building, where there were no security cameras, and, a few minutes later, Finch followed him into the building. The two men reemerged together, with Finch holding in his hands a plastic bag that contained what

---

[1] The Court's description of events is based on its review of the video footage that was provided to the Court, the testimony and evidence presented at the suppression hearing, and the parties' briefing on the motion to suppress.

[2] At the hearing, officers occasionally referred to the building at 960 Parker Street as "964 Parker Street."

appeared to be white powder.  About three minutes later, Stevens saw Gibbons holding

something that Stevens believed to be a plastic bag, although the video footage is not clear.

Stevens texted Ball and Dennis Medina ("Medina"), another Boston Police Department

detective, who had both been investigating Gibbons as part of an ongoing investigation of the

Heath Street Gang, which operated out of the Mildred C. Hailey Apartments and whose members

had been involved in numerous crimes involving drugs and firearms.  He told them he had seen

Finch pull out the bag before the two men went inside and that "later on Gibbons also ha[d] a

bag and it appear[ed] to be the same one that [F]inch was holding earlier."  In a memorandum

dated September 30, 2022, Stevens later wrote that he had "observed . . . [Gibbons] produce a

small plastic bag with a white substance from his pocket" and "subsequently put the bag back

into his pocket," without mentioning Finch.[3]

As part of the ongoing investigation, Ball had reviewed Gibbons's criminal history,

which included convictions for drug distribution, one of which arose from a 2006 arrest in the

Mildred C. Hailey Apartments, assault and battery on a police officer, and crimes involving

dangerous weapons.  Based on this criminal history and the fact that Gibbons frequently spent

time in the Mildred C. Hailey Apartments, where he was observed interacting with members of

the Heath Street Gang, Ball believed that Gibbons was an associate or member of the Heath

Street Gang.

At 9:02 p.m., Ball texted fellow officers that "Gibbons might have just re-upped from

Dominique Finch" and that he was "[t]rying to get eyes on him now."  Around that time, Stevens

---

[3] The description of events in Stevens's texts to Ball and Medina, the memorandum that Stevens
prepared later that evening, and Stevens's testimony at the suppression hearing are not entirely
consistent with the surveillance footage, but the Court concludes that, based on the surveillance
footage, Stevens had reasonable suspicion that Gibbons had been involved in a drug transaction.

saw Gibbons on a security camera standing with several other men on an exterior platform outside the front entrance to the building at 287 Centre Street that, according to Stevens, was a focal point of drug use and trafficking in the housing development.  Three of the other men were known to law enforcement and had criminal records involving violence.  Stevens relayed the information about Gibbons's whereabouts to Ball, and a group of officers, including Ball, Alldredge, and Stevens, then went to 287 Centre Street, arriving at approximately 9:33 p.m. Gathering a group of officers in such situations was a common practice, based on concerns for officer safety; officers had been assaulted inside the housing development in situations involving crowds on numerous occasions.

  The ensuing interaction between the officers and the men was captured on several officers' body-worn cameras.  The officers approached the men, including Gibbons, who was standing with his hands in his pockets.  Gibbons was not making any sudden or furtive movements or clutching his waistband, and the officers did not see anything sticking out of his clothing.  Alldredge walked past Gibbons and into the hallway of the apartment building and then came back outside where he asked Gibbons, "What's up, man?" and then told him to take his hands out of his pockets.  Gibbons complied, taking his hands out his pockets, but said to Alldredge, "Don't touch me, bro" and "What are you even talking about?"  Alldredge then asked Gibbons what he was chewing on and shone a flashlight in his face, and, according to his testimony at the suppression hearing, he saw a substance consistent with crack cocaine in Gibbons's mouth.  Gibbons denied that there was anything in his mouth and told Alldredge to stop pointing the flashlight in his face.  Alldredge put away the flashlight, but then grabbed Gibbons's right elbow with his left hand and attempted to pat Gibbons's jacket pocket with his right hand, saying "Nothing on you, right, bro?"  When Gibbons pushed Alldredge's hands back,

Alldredge took steps to restrain and handcuff him, and a two-and-a-half-minute struggle ensued during which Alldredge and the other officers brought Gibbons to the ground and ultimately tased him.

During the struggle, Gibbons repeatedly told the officers that he was not doing anything wrong and did not have an outstanding arrest warrant and asked them what he had done and why they were grabbing him; the officers told him to put his hands behind his back, to relax, and to stop resisting. Gibbons repeatedly asked the officers whether he was under arrest, without receiving an answer. After he was tased, he continued to tell the officers that he did not have a warrant and had not done anything wrong and that what they were doing was illegal; he also asked the officers what he was being arrested for.

Once the officers had subdued and handcuffed Gibbons, Ball searched him and found several bags of cocaine, a small bag of fentanyl, a folding knife, and 373 dollars. Gibbons was then told that he was under arrest and eventually charged in state court with drug possession and resisting arrest. The Commonwealth dismissed all charges against him on February 2, 2023.

### B.    Procedural Background

The government initiated this case by sealed criminal complaint on February 9, 2024. [ECF No. 4]. Gibbons was arrested on February 14, 2024, and agreed to voluntary detention at his initial appearance. [ECF Nos. 5, 9]. On July 16, 2024, a federal grand jury indicted him on one count of possession with intent to distribute controlled substances and aiding and abetting in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. [ECF No. 20]. Gibbons filed the instant motion to suppress on May 20, 2025, [ECF No. 68], which the government opposed on June 12, 2025, [ECF No. 77]. Gibbons filed a reply on November 14, 2025, [ECF No. 91], and the government filed a surreply on December 12, 2025, [ECF No. 94]. The Court held a hearing on

the motion on December 17, 2025, at which Stevens, Ball, and Alldredge testified.  [ECF No. 95].  After the hearing, the parties filed supplemental briefs.  [ECF Nos. 98, 99].

## II.    DISCUSSION

Gibbons argues that the government violated his Fourth Amendment rights because it did not have a sufficient justification to detain and pat him down under Terry v. Ohio, 392 U.S. 1 (1968). [ECF No. 69].  The government argues that the stop and frisk were permissible under Terry and that Gibbons committed crimes during his encounter with the police that provided an independent justification to arrest and then search him.  [ECF No. 77].

### A.    Terry Stop and Pat-Frisk

The Fourth Amendment protects against "unreasonable searches and seizures," U.S. Const. amend. IV, and evidence obtained in violation of the Fourth Amendment can generally not be used against a criminal defendant at trial, United States v. Harrington, 56 F.4th 195, 200 (1st Cir. 2022) (citing Weeks v. United States, 232 U.S. 383 (1914); Mapp v. Ohio, 367 U.S. 643 (1961); United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011)).

"The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops," in which a police officer "approach[es] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  Harrington, 56 F.4th at 201 (first quoting Camacho, 661 F.3d at 724; and then quoting Terry, 392 U.S. at 22).  For a Terry stop to comply with the Fourth Amendment, the officer must have "'reasonable, articulable suspicion of an individual's involvement in some criminal activity' at the inception of the stop."  United States v. Howard, 66 F.4th 33, 44 (1st Cir. 2023) (quoting United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017)).  "Both the initial seizure and the actions the police take thereafter must be

reasonable." United States v. Dancy, 640 F.3d 455, 461 (1st Cir. 2011). Terry's reasonable-suspicion standard is "less demanding" than probable cause, but it still requires the officer to "possess (and be able to articulate) more than a hunch, an intuition, or a desultory inkling of possible criminal activity." Harrington, 56 F.4th at 201 (quoting United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)).

The Court assesses whether the reasonable-suspicion standard has been met based on "the totality of the circumstances" and from the point of review of "a reasonable officer in [the officer's] position," that is, without considering the officer's subjective motives. Harrington, 56 F.4th at 201. "Evaluating whether an officer's suspicions are (or are not) reasonable is a fact-sensitive task," requiring some "[d]eference . . . to the experienced perceptions of the officers, . . . but not blind deference; these perceptions must be reasonable under an objective standard." United States v. Cardona-Vicente, 817 F.3d 823, 827 (1st Cir. 2016) (first quoting United States v. Chhien, 266 F.3d 1, 8 (1st Cir. 2001); and then quoting United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000)). "[W]here law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop." United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002); see also United States v. Balser, 70 F.4th 613, 619–20 (1st Cir. 2023) (distinguishing between "[v]ertical collective knowledge cases," in which an officer with knowledge "directs" an officer without knowledge, and "horizontal cases," in which "courts pool or 'aggregate information available to . . . all the officers involved in the investigation,'" and noting that the First Circuit "ha[s] repeatedly permitted the aggregation of information among multiple officers involved in an investigation" (quoting United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999))).

If the <u>Terry</u> stop is lawful <u>and</u> the officer has "reasonable suspicion" that the person "is armed and dangerous to the officer or others," the officer may engage in a "limited search of the other clothing of [the person] in an attempt to discover weapons which might be used to assault [the officer]," a search known as a "<u>Terry</u> pat-frisk." <u>Harrington</u>, 56 F.4th at 203 (first quoting <u>United States v. McKoy</u>, 428 F.3d 38, 39 (1st Cir. 2005); and then quoting <u>Terry</u>, 392 U.S. at 30). "The reasonable suspicion standard for the pat-frisk is the same as that for the initial stop except [that] it focuses on whether the individual is 'armed and dangerous.'" <u>Id.</u> (quoting <u>McKoy</u>, 428 F.3d at 39).

Applying the principles of <u>Terry</u> and its progeny to this case involves two questions: (1) did Alldredge have a reasonable, articulable suspicion that Gibbons was engaged in criminal activity, thus making his initial detention of Gibbons a valid <u>Terry</u> stop; and (2) did Alldredge have a reasonable, articulable suspicion that Gibbons was armed and dangerous, such that his attempted pat-frisk of Gibbons was legally justified? <u>See</u> <u>Camacho</u>, 661 F.3d at 725.[4]

Here, Alldredge's detention of Gibbons was permissible under <u>Terry</u>. The totality of the circumstances, which included Stevens's earlier observation of Gibbons engaging in what appeared to be a drug transaction, Gibbons's presence in a specific part of the housing development known to be a hub of drug trafficking, and his criminal history provided reasonable suspicion to justify a brief investigatory stop. <u>E.g.</u>, <u>United States v. Arnott</u>, 758 F.3d 40, 42–44 (1st Cir. 2014) (finding reasonable suspicion based on observations of defendant's activities "for several weeks" and an officer's observation of "what appeared to have been a drug deal" before the stop); <u>United States v. Rabbia</u>, 699 F.3d 85, 90 (1st Cir. 2012) (finding reasonable suspicion

---

[4] The government does not dispute that Gibbons was seized for Fourth Amendment purposes. <u>See</u> [ECF No. 77 at 7–9]. The parties take no clear position on when exactly the seizure occurred. <u>See</u> [<u>id.</u>]; [ECF No. 69 at 6].

based on officer's observation of behavior "consistent with the consummation of a drug deal" and the defendant's "presence late at night in an area known to be a hotbed of drug activity"); accord United States v. Carmona, 103 F.4th 83, 91 (1st Cir. 2024) ("[A]n officer's reasonable, articulable suspicion of a defendant's involvement in past criminal activity may ground a permissible Terry stop.").

Alldredge's attempted pat-frisk of Gibbons, however, violated the Fourth Amendment because he did not have reasonable suspicion that Gibbons was armed and dangerous.  For "certain crimes that . . . are 'associated with' violence . . . 'the same information that will support an investigatory stop will without more support a frisk.'"  United States v. Belin, 868 F.3d 43, 50 (1st Cir. 2017) (quoting United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001)).  As relevant here, "large-scale trafficking in illegal drugs" qualifies as such a crime, given, as the First Circuit has put it, that "[t]he connection between drugs and violence is . . . legendary."  Id. (quoting United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014)).  "[S]uspected cases of street-dealer-level transactions" may also qualify, "at least where the suspect also appeared unusually anxious at the time of the stop," id.; see also Arnott, 758 F.3d at 45 (upholding frisk where defendant's "hands were shaking so badly that he could scarcely hold out his driver's license" when questioned and "police had strong reasons to believe" he "had just concluded a drug-related transaction"); United States v. Dubose, 579 F.3d 117, 119–22 (1st Cir. 2009) (upholding frisk where, after a meeting involving defendant that officers thought might be a drug transaction, defendant initially refused to remove his hand from his pocket and exhibited a "nervous demeanor"), or where there are other specific and articulable facts that, "combined with the common association between drug transactions and weapons g[ive] the police reason to suspect the presence of a traditional weapon as contemplated by Terry," Harrington, 56 F.4th at 204

(upholding frisk based on "observation of two men passed out" and "clear signs of opioid impairment" in a high-crime area, where defendant "reach[ed]" for something and exhibited "noncompliance on more than one occasion"); see also United States v. Rasberry, 882 F.3d 241, 248 (1st Cir. 2018) (upholding frisk of "suspected drug trafficker" in motel room "because the officers were entering an unfamiliar space to confront a suspect who they knew had a criminal history involving firearms and who had recently been present in locations where guns were found").

Here, while an officer in Alldredge's position could reasonably suspect that Gibbons had recently engaged in a street-dealer-level drug transaction, he did not have reasonable grounds to suspect that Gibbons was armed and dangerous. Gibbons did not appear nervous or raise his voice during his encounter with Alldredge, and he complied with the officer's order to remove his hands from his pockets. In fact, based on the Court's review of the video footage and the testimony at the suppression hearing, nothing in Gibbons's behavior immediately preceding the pat-risk provided any indication that he might pose a danger to Alldredge or the other officers. The Court does not close its eyes to Gibbons's criminal history or his presence in what police credibly described as a focal point for drug trafficking, but allowing an automatic pat-frisk of Gibbons at any time under these circumstances would eviscerate the particularized inquiry demanded by Terry and its progeny. See United States v. Cortez, 449 U.S. 411, 417–18 (1981) (requiring officers to have "a particularized and objective basis for suspecting the particular person stopped of criminal activity"); Terry, 392 U.S. at 22 n.18 (noting that the "demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence"); McKoy, 428 F.3d at 40–41 (refusing to adopt standard that "comes too close to allowing an automatic frisk of anyone who commits a

traffic violation in a high-crime area" and appears nervous). Simply put, it is not reasonable under current case law to automatically infer that a person is armed and dangerous simply because he has a criminal history and officers believe that he recently engaged in a street-dealer-level drug transaction, even in a high-crime neighborhood. Alldredge's pat-frisk of Gibbons thus violated the Fourth Amendment.[5]

### B.    Attenuation

"The fruit-of-the-poisonous-tree doctrine is an extension of the Fourth Amendment exclusionary rule that requires 'indirect fruits' recovered after an initial Fourth Amendment violation to be suppressed if they 'bear a sufficiently close relationship to the underlying illegality.'" United States v. Sierra-Ayala, 39 F.4th 1, 16 (1st Cir. 2022) (quoting Camacho, 661 F.3d at 729). That doctrine, however, is subject to several exceptions, including the attenuation doctrine, which allows evidence to be admitted "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." Utah v. Strieff, 579 U.S. 232, 238 (2016). "The 'key inquiry' is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made

---

[5] The Court recognizes that officers operating within the Mildred C. Hailey Apartments have a difficult and, at times, dangerous job, and does not mean to suggest that it could never be reasonable for an officer in Alldredge's position to fear for his safety in this type of situation. That said, in this instance, Alldredge and the other officers present engaged with the group of men in a casual and familiar way, including entering the hallway of the building and turning their backs to them before the Terry frisk. Gibbons was cooperative and at ease until Alldredge abruptly reached down toward Gibbons's lower abdomen and, even then, Gibbons did not reach into his pocket as if for a weapon, but rather pushed Alldredge's hand away as if to protect himself or what was in his pocket from the officer's touch. Although patting Gibbons's pocket might have resulted in the discovery of a weapon, here, it was not reasonable under the circumstances to suspect that Gibbons was armed and dangerous, even according the officers' perceptions the deference that they are due. The Court stops short of finding that the frisk was pretextual, but cautions that while a Terry frisk to ensure the safety of officers is permissible, using a Terry frisk as a pretext for grabbing drugs is not.

has been come at by <u>exploitation</u> of that illegality or instead by means sufficiently

distinguishable to be purged of the primary taint.'" <u>Sierra-Ayala</u>, 39 F.4th at 17 (quoting <u>United

States v. Cordero-Rosario</u>, 786 F.3d 64, 75–76 (1st Cir. 2015)); <u>see also Camacho</u>, 661 F.3d at

729 (noting that "[t]he Supreme Court has declined to adopt a simple 'but for' test that would

mandate suppression of any evidence that 'came to light through a chain of causation that began

with' . . . [a] Fourth Amendment violation" (quoting <u>United States v. Leon</u>, 468 U.S. 897, 910–

11 (1984))).  The taint inquiry takes several factors into consideration, including (1) "the

'temporal proximity' between the unconstitutional conduct and the discovery of the evidence,"

(2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the

official misconduct." <u>Strieff</u>, 579 U.S. 232 at 239 (quoting <u>Brown v. Illinois</u>, 422 U.S. 590, 603–

04 (1975)).

  As relevant here, under the attenuation doctrine, evidence seized following a suspect's

arrest for a new, intervening crime may be admitted.  If a suspect responds to a stop or search—

even an unlawful one—by committing a new crime, police may arrest him for that crime.  <u>United

States v. Mouscardy</u>, No. 10-cr-10100, 2011 WL 2600550, at *3 (D. Mass. June 28, 2011) ("If a

suspect's response to an illegal stop is 'itself a new, distinct crime, then the police

constitutionally may arrest the [suspect] for that crime.'" (quoting <u>United States v. Sprinkle</u>, 106

F.3d 613, 619 (4th Cir. 1997))), <u>aff'd</u>, 722 F.3d 68 (1st Cir. 2013).  Once police have arrested the

suspect, they may perform a warrantless search of his person, a "search incident to arrest."

<u>United States v. Bizier</u>, 111 F.3d 214, 217, 219 (1st Cir. 1997).[6]  Evidence seized during a search

---

[6] This search may take place after or immediately before the suspect's formal arrest.  <u>See</u> <u>Bizier</u>,
111 F.3d at 219; <u>accord</u> <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 111 (1980) ("Where the formal
arrest followed quickly on the heels of the challenged search of petitioner's person, we do not
believe it particularly important that the search preceded the arrest rather than vice versa.").

incident to arrest may be admitted even if the initial stop or seizure violated the Fourth

Amendment.  Camacho, 661 F.3d at 730 (agreeing that defendant's "actions of shoving [the

police officer] and resisting arrest provided grounds for his arrest and a search incident to that

arrest"); United States v. Wilkins, 451 F. Supp. 3d 222, 227 (D. Mass. 2020) ("Even where a

stop is found illegal, an intervening act or independent event may break the chain of causation

and dissipate any taint—this is true even where a defendant's criminal act is precipitated by

police misconduct."); United States v. Dancy, No. 04-cr-10387, 2007 WL 2789279, at *4 (D.

Mass. Sept. 25, 2007) ("[E]ven if the initial seizure of [the defendant] by [the police officer] was

unjustified, [the defendant's] forcible resistance to the arrest would have been an intervening act

sufficient to break the chain of causation and dissipate the taint of any illegality, thereby giving

the officers fresh grounds for an arrest."), aff'd, 640 F.3d 455 (1st Cir. 2011).

Here, the government argues that the officers lawfully arrested Gibbons for (1)

committing assault and battery on a police officer in violation of Mass. Gen. Laws ch. 265,

§ 13D, based on Gibbons's pushing away of Alldredge's hand when Alldredge attempted to pat-

frisk him, and (2) resisting arrest in violation of Mass. Gen. Laws ch. 268, § 32B, based on

Gibbons's ensuing struggle with the officers.  [ECF No. 77 at 15–19]; [ECF No. 94 at 2–9].[7]

Gibbons's reaction to Alldredge's attempted pat-frisk arguably provided law enforcement

with probable cause to arrest him for assault and battery on a police officer.  Under

Massachusetts law, a person commits that crime when he "commits an assault and battery upon

any public employee when such person is engaged in the performance of his duties at the time of

such assault and battery."  Mass. Gen. Laws ch. 265, § 13D.  As relevant here, assault and

---

[7] The government's opposition also mentions "interference with an officer," but it does not
develop any argument based on this alleged crime.  [ECF No. 77 at 15, 16 n.14]; see also [ECF
No. 91 at 6 n.3]; [ECF No. 94 at 4].

battery includes "offensive battery," which is defined as "any unconsented touching that constitutes an 'affront to the victim's personal integrity.'" United States v. Faust, 853 F.3d 39, 55 (1st Cir. 2017) (quoting Commonwealth v. Eberhart, 965 N.E.2d 791, 798 (Mass. 2012)). "Assault and battery requires a touching that is intentional, not simply the result of an intentional act," but "[p]robable cause of a defendant's intent" may be inferred from "the totality of the circumstances." Commonwealth v. Tyson, 244 N.E.3d 508, 513 (Mass. App. Ct. 2024), review denied, 253 N.E.3d 595 (Mass. 2025).

Here, it was reasonable to believe that, when Gibbons pushed back Alldredge's hands, he intentionally touched him without his consent, and that Gibbons had therefore committed the crime of assault and battery on a police officer. See Faust, 853 F.3d at 55. Gibbons's attempt to distinguish cases such as Mouscardy based on the amount of force used by the defendant, [ECF No. 91 at 7], is unpersuasive, because offensive battery—unlike "harmful battery"—requires only an unconsented touching, no matter how "slight." Eberhart, 965 N.E.2d at 798; see also LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 136 (D. Mass. 2007) ("Neither violence nor the use of force is an essential element of [assault and battery on a police officer]."), aff'd, 550 F.3d 166 (1st Cir. 2008). Similarly, although Gibbons suggests that his push was reflexive, rather than intentional, [ECF No. 91 at 8], the Court finds that the officers had probable cause that he acted with the requisite intent, see Tyson, 244 N.E.3d at 513.

Gibbons's main argument, however, is not that he did not intentionally touch Alldredge, but that he was not arrested for (or later charged with) assault and battery on a police officer, and that, accordingly, his push of Alldredge did not interrupt the causal connection between the unconstitutional pat-frisk and the subsequent search. [ECF No. 91 at 6–8]. The Court agrees. Although the police may have had probable cause to arrest Gibbons for assault and battery on a

14

police officer—and although the existence of probable cause does not turn "upon the offense actually invoked by the arresting officers but upon . . . the facts known at the time of the arrest," Robinson v. Cook, 863 F. Supp. 2d 49, 65 (D. Mass. 2012) (quoting United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005)), aff'd, 706 F.3d 25 (1st Cir. 2013)—Gibbons's push of Alldredge's hand was so closely connected to Alldredge's illegal attempt to pat-frisk him that any evidence seized following an arrest for assault and battery would be tainted by Alldredge's misconduct. See Strieff, 579 U.S. 232 at 239.  Thus, the Court holds that Gibbons's alleged assault and battery does not constitute an intervening circumstance that justifies applying the attenuation exception to the fruit-of-the-poisonous-tree doctrine.

That said, Gibbons was not arrested immediately following his push of Alldredge's hand. He was arrested after an extended struggle with the officers, and it was that struggle, separated from the pat-frisk and the alleged assault, that provided probable cause to arrest Gibbons for resisting arrest.

Under Massachusetts law, the crime of resisting arrest

requires proof that (1) the defendant prevented or attempted to prevent a police officer from making arrest; (2) the defendant did so by using or threatening to use physical force or violence against the officer or another or by using any other means that create a substantial risk of causing bodily injury to the officer or another; (3) the defendant did so knowingly; and (4) the officer was acting under color of official authority in the sense that the officer was called on to make, and did make a judgment to arrest in good faith, based on the surrounding facts and circumstances.

Commonwealth v. Manolo M., 261 N.E.3d 832, 842 (Mass. 2025).  It is a crime to resist even an unlawful arrest if the police officer (1) "in attempting to make the arrest was not resorting to unreasonable or excessive force giving rise to the right of self-defense" and (2) made "a judgment in good faith based upon surrounding facts and circumstances that an arrest should be made."  Mass. Gen. Laws ch. 268 § 32B(b).  "[W]hether an officer had probable cause to arrest a

defendant for a particular offense is relevant to, but not necessarily decisive of, whether the officer . . . made a good-faith decision to arrest the defendant." Manolo M., 261 N.E.3d at 842. A defendant is not guilty of the crime of resisting arrest, however, if "the circumstances fall so short of establishing probable cause to arrest as to preclude a rational inference that the arresting officer made the judgment to arrest in good faith." Id.

"The offense of resisting arrest must happen 'at the time of the "effecting" of an arrest.'" Manolo M., 261 N.E.3d at 851 (quoting Commonwealth v. Grandison, 741 N.E.2d 25, 35 (Mass. 2001)). "While effecting arrest may be a 'process,' it occurs where there is (1) an actual or constructive seizure or detention of the person, (2) performed with the intention to effect an arrest and (3) so understood by the person detained." Id. (citation modified). "The standard for determining whether a defendant understood that he was being arrested is objective—whether a reasonable person in the defendant's circumstances would have so understood." Commonwealth v. Manolo M., 225 N.E.3d 318, 325 (Mass. App. Ct. 2023) (quoting Commonwealth v. Grant, 880 N.E.2d 820, 823 (Mass. App. Ct. 2008)), aff'd, 261 N.E.3d 832 (Mass. 2025).[8]

Here, the Court concludes that the police had probable cause to arrest Gibbons for resisting arrest. First, the officers could have reasonably believed that Gibbons was trying to prevent them from arresting him. Based on the Court's review of the surveillance footage, the officers were attempting to arrest Gibbons as he struggled with them, and Gibbons understood this, as evidenced by his comments to the officers, including that he had not done anything wrong and did not have an outstanding arrest warrant and, later, by him asking what he was

---

[8] The Court notes that this state-law standard is similar to the federal constitutional standard for determining when a "de facto arrest" occurs, which is when "a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." United States v. Jones, 700 F.3d 615, 624 (1st Cir. 2012) (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)).

being arrested for.  See, e.g., Commonwealth v. Clark, 180 N.E.3d 1037 (Mass. App. Ct. 2022)

(unpublished table decision) (describing "encounter" that "evolved from a limited search to an

arrest" when defendant "was tackled to the ground, told repeatedly to 'give us your hands,'

and . . . to 'put your hands behind your back'").   Although the officers did not explicitly tell

Gibbons that he was under arrest until after they searched him, "[a]n arrest can occur even if the

police do not make a formal arrest."  Grandison, 741 N.E.2d at 35.  Thus, there was probable

cause to believe that Gibbons's struggle with the officers was an attempt to prevent them from

arresting him.

Second, it was reasonable for officers to believe that Gibbons in his struggle used

physical force against the officers or used means that created a substantial risk of bodily injury to

the officers.  "[W]hether a defendant resisted arrest through either or both of the two means

prohibited by the statute 'is an intensely factual, nuanced inquiry that must consider the nature of

the defendant's conduct or actions and the sequence of those actions in relation to corresponding

action by the police officers involved.'"  Manolo M., 261 N.E.3d at 849 (quoting

Commonwealth v. Hart, 4 N.E.3d 1231, 1236 (Mass. 2014)).  Here, Gibbons's continued

struggle with the officers, despite the officers' commands to stop resisting, which necessitated

the involvement of several officers and the use of a taser, reasonably amounted to the use of

prohibited means in resisting arrest.

Third, there was probable cause to believe that Gibbons's resistance to arrest was

knowing, because he repeatedly told police that he did not have an outstanding arrest warrant and

had not done anything wrong and because police employed force consistent with an arrest and

repeatedly told him to put his hands behind his back and to stop resisting.

Fourth, although the issue is close, the Court finds that police made a good-faith judgment to arrest Gibbons under the circumstances. As discussed supra, police had reason to believe that Gibbons had been involved in a drug transaction and, although they did not invoke this offense in arresting Gibbons, they also had probable cause to arrest him for assault and battery on a police officer. Although the grounds for Gibbons's arrest are somewhat thorny given the illegal pat-frisk and the close temporal proximity of Gibbons's ensuing struggle with the officers, the Court cannot say that "the circumstances f[ell] so short of establishing probable cause to arrest as to preclude a rational inference that the arresting officer made the judgment to arrest in good faith." Manolo M., 261 N.E.3d at 842. Accordingly, the Court concludes that police had probable cause to arrest Gibbons for resisting arrest.

The Court also holds that Gibbons's struggle with the police, which provided probable cause to arrest him for resisting arrest, was an intervening act that broke the chain of causation between Alldredge's illegal pat-frisk and the discovery of the evidence. Although the search of Gibbons occurred only minutes after the illegal pat-frisk, it followed a lawful arrest, and, as discussed supra, the pat-frisk, while illegal, was not a flagrant example of police misconduct. See Strieff, 579 U.S. 232 at 239. Under the circumstances, the Court is convinced that the search was based on Gibbons's intervening actions rather than amounting to an "exploitation" of the illegal pat-frisk. Sierra-Ayala, 39 F.4th at 17 (quoting Cordero-Rosario, 786 F.3d at 76). Thus, under the attenuation doctrine, the evidence seized as part of that search may be admitted.

Gibbons's counterarguments are unavailing. He argues that the evidence at issue was the product of the illegal stop and pat-frisk, not any subsequent arrest; and that he was resisting the illegal pat-frisk rather than the arrest, which is not a crime under Massachusetts law. [ECF No. 91 at 5–10]. As discussed supra, however, Gibbons not only resisted Alldredge's attempted pat-

frisk, but continued resisting when the officers tried to subdue and then arrest him, and the evidence was discovered after Gibbons was arrested rather than after the initial pat-frisk. Although Alldredge's initial pat-frisk of Gibbons may have been a but-for cause of the officers' subsequent discovery of the evidence, the Supreme Court's cases require a closer causal connection for suppression.  See Camacho, 661 F.3d at 729.  In this instance, the Court is convinced that Gibbons's intervening struggle with the officers broke the chain of causation and dissipated any taint from the unlawful pat-frisk.  See id. at 730; Wilkins, 451 F. Supp. 3d at 227; Dancy, 2007 WL 2789279, at *4.

Gibbons also directs the Court to several cases that have superficial similarities to the facts here but are ultimately distinguishable.  [ECF No. 69 at 10]; [ECF No. 91 at 6].  In Camacho, a police officer conducted a frisk and discovered the evidence at issue before the defendant shoved him and was arrested.  661 F.3d at 730–31.  In contrast, here, the officers did not discover any evidence during Alldredge's frisk of Gibbons or even during the officers' struggle with Gibbons, but rather only after he had been subdued, shortly before his formal arrest.  Gibbons also relies on Massachusetts cases in which courts found that officers were engaging in renewed attempts to frisk defendants, rather than basing their actions, in part, on defendants' intervening actions.  [ECF No. 91 at 6 (citing Commonwealth v. Martin, 927 N.E.2d 432, 433–34, 438 (Mass. 2010); Commonwealth v. Borges, 482 N.E.2d 314, 320 (Mass. 1985))]. In this case, however, officers were not merely renewing their attempt to frisk Gibbons but rather searched him only after an extended struggle, following which Gibbons was arrested for and charged with resisting arrest in addition to drug possession.

In conclusion, although Gibbons's initial resistance to Alldredge's attempts to pat-frisk and then handcuff him arguably did not violate Mass. Gen. Laws ch. 268, §32B, his continued

struggle with multiple officers, who brought him to the ground and ultimately tased him, did.  At that point, Gibbons was not merely refusing to be handcuffed as part of a <u>Terry</u> stop or resisting a pat-frisk, as he argues, [ECF No. 91 at 8–9], but rather was actively resisting arrest.  Gibbons's independent criminal act of resisting arrest broke the chain of causation and dissipated the taint of the illegal pat-frisk, meaning that the evidence seized as part of the search incident to his arrest need not be suppressed.

The Court acknowledges that this is a somewhat uncomfortable resolution.  Gibbons's resistance gave the officers probable cause to arrest him, but he may not have acted the way that he did in the absence of the unconstitutional pat-frisk, and the officers' actions, as much as Gibbons's, appear to have escalated the situation, creating a basis for his arrest where initially there was arguably none.  Based on the facts before it, however, the Court concludes that the officers had probable cause to arrest Gibbons for resisting arrest and that the discovery of the evidence at issue was a result of a search incident to that arrest rather than of the earlier pat-frisk.  Under these circumstances, denying Gibbons's motion to suppress appears unlikely to reward unduly or to incentivize unconstitutional conduct by law enforcement, which are the concerns that animate the exclusionary rule and the fruit-of-the-poisonous-tree doctrine.  On the contrary, applying the attenuation doctrine here discourages violence against police, leaves disputes over the lawfulness of police conduct to the courts, and honors the policy concerns that drove Massachusetts to criminalize resisting arrest in all but the most exceptional of circumstances.  <u>See</u> <u>Commonwealth v. Moreira</u>, 447 N.E.2d 1224, 1227 (Mass. 1983); <u>Commonwealth v. Gomes</u>, 795 N.E.2d 1217, 1224 (Mass. App. Ct. 2003) ("Notwithstanding the high value accorded the right to personal privacy, the modern view is to abolish or sharply curtail the use of force to resist police action."); Mass. Gen. Laws ch. 268, § 32B(b) (making resistance unlawful

unless police "in attempting to make the arrest . . . resort[s] to unreasonable or excessive force"

or makes an arrest without making "a judgment in good faith . . . that an arrest should be made").

**III.**     **CONCLUSION**

For the reasons set forth above, Gibbons's motion to suppress evidence, [ECF No. 68], is

**<u>DENIED</u>**.

     **SO ORDERED.**

March 5, 2026                                         */s/ Allison D. Burroughs*
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE